# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-18-00203-CV

---

**J. A. and J. H., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE DISTRICT COURT OF BELL COUNTY, 146TH JUDICIAL DISTRICT
NO. 283,499-B, HONORABLE JACK WELDON JONES, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

J. A. ("Jennifer")[1] and J. H. ("John") appeal the trial court's decree terminating their parental rights to their three children who, at the time of the bench trial, were ages seven ("Mary"), five ("Ann"), and two ("Johnny"). Jennifer and John contend that the evidence is legally and factually insufficient to support the trial court's finding that termination of their parental rights was in the best interest of the children. We will affirm the termination decree.

## DISCUSSION

A trial court may terminate a parent's parental rights if clear and convincing evidence shows that the parent committed conduct that amounts to a statutory ground for termination and that termination of parental rights would be in the child's best interest. *See* Tex. Fam. Code § 161.001(b);

---

[1] We will refer to the children and their family members by aliases. *See* Tex. R. App. P. 9.8 (related to protection of minor's identity in cases involving termination of parental rights).

*In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). Jennifer and John concede that there is legally and factually sufficient evidence to support the trial court's finding that they each committed a statutory ground for termination[2] but challenge the evidentiary sufficiency to support the trial court's best-interest finding.

In reviewing the legal sufficiency of the evidence, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief or conviction that the finding was true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We assume that the factfinder resolved disputed facts in favor of the finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible. *Id.* at 573; *see In re K.M.L.*, 443 S.W.3d 101, 112–13 (Tex. 2014).

In evaluating factual sufficiency, we view the entire record and uphold the finding unless the disputed evidence that could not reasonably have been credited in favor of a finding is so significant that the factfinder could not reasonably have formed a firm belief or conviction that the Department's allegations were true. *In re A.B.*, 437 S.W.3d 498, 502–03 (Tex. 2014) (citing *J.F.C.*, 96 S.W.3d at 266; *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002)). We defer to the factfinder's reasonable determination on issues of credibility that involve an evaluation of appearance or

---

[2] The trial court found that Jennifer and John each (1) knowingly placed or knowingly allowed the children to remain in conditions and surroundings that endangered the children's physical and emotional well-being; (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical and emotional well-being; and (3) failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the children. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O).

demeanor, *J.P.B.*, 180 S.W.3d at 573, and we resolve disputed evidence in favor of the finding if a reasonable person could have found it clear and convincing, *J.F.C.*, 96 S.W.3d at 266.

John's appellate argument is centered on his contention that because the children did not testify and their guardian ad litem did not expressly ask them the question, "what are your wishes," with respect to termination and their relationship with their parents, "it is impossible to determine that termination of the parent-child relationship was in the best interest of the children." *See* Tex. Fam. Code § 107.002(b)(2) (providing that guardian ad litem shall "seek to elicit in a developmentally appropriate manner the child's expressed objectives"). He relatedly complains that the children's attorney ad litem, therefore, "did not advocate for the expressed desires of the children" as required by the Family Code. *See id.* § 107.003(a)(1)(B) (providing that attorney ad litem shall "seek to elicit in a developmentally appropriate manner the child's expressed objectives of representation"). Essentially, John complains that there was no evidence of the first *Holley* factor (i.e., the children's desires), *see Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976), which he contends precluded the trial court from making its best-interest finding. Jennifer's argument globally attacks the evidentiary sufficiency to support the trial court's best-interest finding, relying primarily on evidence that she contends demonstrates that she "had alleviated the cause for removal of the children [i.e., drug use] and had shown that she could provide a safe and suitable environment for the children at the time of the final hearing" because she had been clean of drugs in the eight to nine months leading up to trial.

A factfinder's best-interest finding is reviewed in light of several factors set out in *Holley*: (1) the child's wishes, if the child is of an appropriate age to express such wishes; (2) the

3

child's present and future emotional and physical needs; (3) present and future emotional and physical danger to the child; (4) the parenting abilities of the individuals seeking custody; (5) programs available to assist those people seeking custody in promoting the child's best interest; (6) plans for the child by the people or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate that the parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Id.* at 371–72. Contrary to John's assertion, the Department need not prove all of the *Holley* factors, and the absence of some factors does not bar the factfinder from finding by clear and convincing evidence that termination is in a child's best interest, especially when there is undisputed evidence that the parental relationship endangered the child. *See C.H.*, 89 S.W.3d at 27. Evidence presented to satisfy a predicate statutory-ground finding may also be probative of the child's best interest. *Id.* at 28.

***Summary of the evidence***

There was evidence at trial related to several of the *Holley* factors, some of which we summarize here. Regarding the children's wishes, the guardian ad litem testified that although she had not specifically asked the children, "what are your wishes," because of their young ages, she had asked them "where they want to live," and the children responded that they want to "stay with [New] Mommy and Daddy."[3] It is reasonable to conclude that such inquiry is developmentally appropriate for children of these ages and that the ad litem's testimony constituted some evidence

---

[3] The guardian ad litem explained on the stand that the children had begun calling the foster parents "Mommy" and "Daddy" and that she clarified with the children that when they used those names, the children were referring to the foster parents—their "New Mommy and Daddy [foster parents]" as opposed to their "Old Mommy and Daddy [Jennifer and John]."

4

of the first *Holley* factor, although we note that the Department was not required to prove any particular factor. *See id.* at 27. John has not cited any authority holding that the alleged failure of an attorney ad litem or guardian ad litem to determine the desires of the children constitutes reversible error, nor would we determine such failure to be reversible error on its face except as it pertains to evidentiary sufficiency. We therefore continue with a review of the evidence in light of the other *Holley* factors.

The guardian ad litem testified that she believed the children were happy, safe, and stable in the foster home, which is a "legal risk" home, meaning that the foster parents want to adopt all three children. The guardian ad litem further testified that the children had never asked her about their parents, such as when they would get to see them or go home with them.

The Department presented evidence of its prior involvement with the family in 2013 when it received a report that John, while intoxicated, had hit Jennifer while she was holding her children and that the children "had blood on them" afterwards. That case was closed after John and Jennifer completed Anger Management classes, individual therapy, couples therapy, Mommy and Me classes, and random drug testing. The Department became involved with the family again in 2015 when it received a report that Jennifer tested positive for marihuana at the time of Johnny's birth.

There was evidence at trial about Jennifer's years-long use of marihuana, including her use of it a few weeks before Johnny's birth, who also tested positive for the drug at birth. There was evidence of Jennifer's repeated use of marihuana during the pendency of the case, despite the removal of her children to the Department's custody and regular court-ordered drug tests, many of which she missed. Although Jennifer testified that she had not used marihuana in the eight or nine

5

months leading up to trial, there were no drug tests admitted into evidence from that time period to corroborate her testimony. The trial court could reasonably have formed a firm conviction that evidence of Jennifer's recent "turnaround" is not a guarantee that her drug problems will not recur and was not required to ignore her long history of dependency. *See In re M.G.D.*, 108 S.W.3d 508, 513 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) ("[E]vidence of a recent turnaround should be determinative only if it is reasonable to conclude that rehabilitation, once begun, will surely continue.").

There was similar evidence about John's years-long use of illegal drugs (including marihuana, cocaine, and methamphetamine) and alcohol abuse as well as his continued use of the substances during the pendency of the case and several missed court-ordered drug tests. On more than one occasion during the pendency of the case, John had vomited immediately prior to court settings and visitations, indicating possible intoxication, although Jennifer testified that the vomiting was due to "upper GI bleeding." Evidence indicated that John had arrived at the hospital to see newborn Johnny either intoxicated or under the influence of drugs and was given a citation for public intoxication.

There was evidence about Jennifer and John's involvement during the pendency of the case with a former neighbor of theirs ("Dizzy") that resulted in John being shot. Jennifer testified that she and John picked up Dizzy to give him a ride somewhere and that "someone [began] shooting at [Dizzy] and [John] got caught in the crossfire." She further admitted that after the Dizzy incident the police found marihuana in her car and that she "was smoking mari[h]uana" at the time. Jennifer testified that she does not believe John still has an alcohol problem because he "overcame his sickness" but also testified that he had not been drinking recently because "[h]e's not working right

6

now to afford beer." Jennifer testified that she and John had been homeless, living in their van and then in shelters after they could no longer make payments on the van, for about three and a half months during the pendency of the case. They began renting a home suitable for raising children about a month before trial and Jennifer is currently employed as a janitor at a school; John was unemployed at the time of trial but had recently performed some "odd jobs." There was evidence that Jennifer and John had become engaged a few months before trial and planned to stay together, although Jennifer testified that she would be willing to be apart from John if the court allowed the children to return only to her.

The record does not indicate that Mary and Ann have any special physical or emotional needs, but the guardian ad litem testified that the foster parents have observed Johnny exhibiting "seizure-like activity" and that "there was [sic] some concerns with his brain activity" that may be related to his in utero exposure to marihuana, for which they have taken him to a neurologist. The record does not contain evidence concerning Jennifer's or John's parenting abilities or those of the proposed adoptive foster parents, although the Department caseworker did testify that there had been no "problems with the children" while at the foster home and that she had no reason to believe that adoption by the foster parents would not be "successful." There was evidence indicating that when the Department removed the children from their parents' custody, it placed them in the custody of John's mother ("Grandmother") at the parents' request but then removed the children from her custody a few months later after discovering that the school-aged girls had missed an inordinate amount of school. There was evidence that, during the time that the children were in Grandmother's custody, Jennifer and John stayed overnight at her house in violation of a court order.

The guardian ad litem testified that neither Jennifer nor John had completed the counseling previously ordered by the court nor availed themselves of any substance-abuse programs such as AA, NA, or Celebrate Recovery, although John testified that he had found support in his recovery process through meeting weekly with the deacon at his church and attending men's-group meetings there. There was also evidence that Jennifer had missed several visitations with her children during the pendency of the case.

### *Evidentiary sufficiency*

While the record in this case is relatively brief, we nonetheless conclude, after viewing the above-summarized and other evidence in the light most favorable to the trial court's finding, that the trial court could reasonably have come to a firm belief or conclusion that termination of Jennifer's and John's parental rights was in the best interest of the children, especially considering the evidence supporting the statutory grounds for termination (i.e., endangerment and failure to complete court-ordered services) and the parents' long history of drug use. Accordingly, we conclude that the evidence is legally sufficient to support the district court's finding by clear and convincing evidence that termination is in the children's best interest.

We reach the same conclusion regarding the factual sufficiency of the evidence after giving due consideration to the disputed evidence in the case. Deferring to the district court's role to assess the credibility of the witnesses, especially as those credibility determinations relate to the parents' asserted recent sobriety, we conclude that the disputed evidence is not so significant that a reasonable factfinder could not form a firm belief or conviction that terminating Jennifer's and John's parental rights was in the best interest of the children. We conclude that the evidence is

8

factually sufficient to support the district court's finding by clear and convincing evidence that termination is in the children's best interest.

## CONCLUSION

We affirm the trial court's decree terminating the parental rights of Jennifer and John to their three children.

_____

David Puryear, Justice

Before Justices Puryear, Pemberton, and Bourland

Affirmed

Filed:   July 18, 2018

9